EMERSON v. FISHER et al.

(Circuit Court of Appeals, First Circuit. November 15, 1917. On Petition for Rehearing, February 5, 1918.)

No. 1270.

1. BANKRUPTCY ⊜⇒303(3)—PROCEEDING BY TRUSTEE—MISMANAGEMENT OF SUBSIDIARY CORPORATION—EVIDENCE.

Where the trustee in bankruptcy of an alleged subsidiary corporation sought to recover damages for alleged mismanagement of the subsidiary corporation by the principal company, of which respondents were receivers, evidence *held* insufficient to show mismanagement, though goods of the alleged subsidiary company were sold at prices below the list prices to raise spot cash.

2. APPEAL AND ERROR ⊜⇒1022(3)—REVIEW—MASTER'S FINDING APPROVED BY COURT—CONFLICTING EVIDENCE.

A finding of the master, upheld by the trial court, based on conflicting evidence, will not be disturbed on appeal.

3. CORPORATIONS ⊜⇒401—OFFICERS—AUTHORITY.

After the resignation of the treasurer of a debtor corporation, who had been applying its funds to payment of obligations due another corporation, the authority of such officer ceased, and with it any authority delegated to an officer of the creditor corporation to make such application by him of funds.

4. CORPORATIONS ⊜⇒426(12)—OFFICERS—ACQUIESCENCE—KNOWLEDGE.

Where the president of a corporation did not know that the treasurer before resignation had authorized an officer of another company to apply its funds, such application cannot be upheld, on the ground that acquiescence amounted to an adoption of the practice.

5. CORPORATIONS ⊜⇒466—NEGOTIABLE INSTRUMENTS—UNAUTHORIZED INDORSEMENT BY OFFICER—EFFECT.

The unauthorized indorsement by an officer of a creditor company of commercial paper belonging to the debtor company did not change title to the paper or to the proceeds.

6. BANKRUPTCY ⊜⇒140(½)—CREDITORS—POSSESSION OF PROPERTY.

Where a creditor company, without authority obtained possession of funds belonging to a debtor corporation, such unauthorized possession of

funds did not, on bankruptcy of the debtor company, entitle the creditor company to apply them to payment of its own claim to the prejudice of other creditors.

Appeal from the District Court of the United States for the District of Massachusetts; Frederic Dodge, Judge.

Bill by Rensselaer L. Curtis against the Walpole Tire & Rubber Company, upon which Robert C. Fisher and another were appointed receivers. Robert S. Emerson, trustee in bankruptcy of the Consumers' Rubber Company, presented a claim. From the decree dismissing the claim for damages for mismanagement, and for an equitable lien on a sum of money, claimant appeals. Decree affirmed as to a dismissal of claim for damages for mismanagement, and reversed in so far as it dismissed the claim for an equitable lien, being affirmed in other respects.

George H. Huddy, Jr., of Providence, R. I. (Mumford, Huddy & Emerson, of Providence, R. I., on the brief), for appellant.

Lee M. Friedman, of Boston, Mass. (Swift, Friedman & Atherton, of Boston, Mass., on the brief), for appellees.

Before BINGHAM, Circuit Judge, and ALDRICH and BROWN, District Judges.

BROWN, District Judge. This is an appeal by Robert S. Emerson, trustee in bankruptcy of the Consumers' Rubber Company, a Rhode Island corporation, from a decree of the District Court confirming a master's report and disallowing two claims against the Walpole Tire & Rubber Company.

The first claim was for damages for mismanagement, and involved two disputed questions of fact:

A. Whether the Walpole Company had assumed control and full management of the affairs of the Consumers' Rubber Company as its subsidiary.

B. Whether the Walpole Company had mismanaged the affairs of the Consumers' Rubber Company to its great financial loss.

Upon both these contentions of fact the master and the District Court found against the appellant.

The second claim is for an equitable lien upon a balance of funds alleged to have been wrongfully taken from the Consumers' Rubber Company and to be now in the hands of the receiver of the Walpole Company. This claim was disallowed by both master and District Court upon grounds that involve questions of both fact and law.

[1] The case is not free from doubt, and is complicated by the fact that the same individuals were in active management of both the Consumers' Company and the Walpole Company, and were not managing either company solely in its own interest, nor solely for their joint interests, but were acting also in the interest of the Atlantic National Bank in a plan for the organization and financing of the present Consumers' Rubber Company, which succeeded a former and deeply insolvent Consumers' Rubber Company, of which the Atlantic National Bank was a large creditor.

The claim for damages through mismanagement is to the amount

of $54,721.66, resulting from so-called sacrifice sales of the great bulk of manufactured goods—rubber shoes, etc.—of the Consumers' Company, and from large discounts on goods already sold, all of which were made to secure spot cash. It is also urged that these sales in bulk were not only an unreasonable sacrifice for the purpose of securing cash, but were made in pursuance of a plan to close out the shoe manufacturing business of the Consumers' Company, and to develop in its place a wire department, to be operated in connection with the Walpole Company's production of wire tape.

We think that the evidence shows a business situation which justified a considerable lowering of prices because of an overstock of goods and a weak market. There was a pressing demand for funds to meet the obligations of the Consumers' Company, and it does not appear that moneys were available from any other source to meet its obligations and carry on its business. To what extent it was necessary or advisable to reduce prices in order to move the goods and procure immediate funds was a matter of business judgment. The District Court was not satisfied upon the evidence that better prices could have been obtained at any time before the bankruptcy of the Consumers' Company, and approved the master's finding to that effect.

We find in the record no evidence that the Walpole Company had bound itself to advance moneys to the Consumers' Company in order to carry it. Even if we should find, contrary to the decision of the District Court, that the Walpole Company had assumed control and management of the Consumers' Company, it would not follow that it was under obligation to advance it moneys or do more than procure for it such credit as the Consumers' Company was entitled to upon its own assets; nor would it follow that the Walpole Company was debarred from applying those assets to reimburse itself for advances and for merchandise sold to the Consumers' Company.

The failure of the Consumers' Company to meet its obligations would probably have led to forced sales at prices much below list prices. The appellant computes its claim of damages by subtracting from list prices the actual prices obtained. It cannot be assumed, however, that list prices of an overstock of goods on hand fairly represented the true value of the goods to the Consumers' Company at the time of sale.

The master, in passing upon the question of mismanagement, properly took into account the fact that the Consumers' Company was greatly in need of funds, and that, in case of an involuntary and forced sale of goods to meet liabilities to creditors, it was to be expected that there would be a large reduction from list prices. A voluntary sale of goods for about two-thirds of the list prices, in order to obviate a forced and involuntary sale, is not so clearly an act of mismanagement as to justify a reversal of the findings of the master and of the District Court upon this question, or to lead us to the conclusion that the sale was made in bad faith, or in total disregard of the rights of the Consumers' Company.

It was found by the District Court that the proceeds of the sales were used to pay off the obligations of the Consumers' Company, and that no part of them went to the Walpole Company, except in payment

of what was due it from the Consumers' Company, and that only a small part of it was used in discharging obligations of the latter class.

That the Walpole Company received from these sales any payments to which it was not legally entitled is not made to appear.

It is suggested in appellant's supplemental brief that as a result of these sales the Walpole Company was paid while other creditors went unsatisfied; but no question of preferences through the application of the proceeds of these sales seems now open on this record.

It is doubtless the fact that the sales were made with regard to the interests of the Walpole Company and of the Atlantic Bank, as well as of the Consumers' Company, and we appreciate the force of the argument that the interests of the Consumers' Company were not as carefully protected as if it had been independently represented. On the other hand, the plan of reorganization of the Consumers' Company contemplated a close relation between the two companies, and reliance upon the facilities and resources of the Walpole Company in order to pull out of hopeless insolvency the affairs of an old and unsuccessful business.

The Walpole Company, whether with or without lawful authority, was being used as the backer and chief reliance of the Consumers' Company, and the financial embarrassment of the backer meant also the further embarrassment of the Consumers' Company. Whether the relation between the two companies was that of principal and subsidiary, or of backer and borrower, it was necessary in the common interest for those in management of both to take care of the Walpole Company as well as of the Consumers' Company. If the Walpole Company had cramped itself by its large advances or credits to the Consumers' Company—advances which it had not legally bound itself to make—it cannot be said that it was clearly unreasonable to require payments of sums due on open account, even at the expense of a considerable sacrifice of expected profits on manufactured goods or of actual values of a large stock of manufactured goods which could not be moved in ordinary course of business.

Upon the whole we find no sufficient reason for disagreeing with the decision of the District Court disallowing the claim for damages for mismanagement.

This renders it unnecessary to consider the many assignments of error relating to the contention that the Walpole Company had become a majority stock owner in the Consumers' Company, and as such had assumed full control and management of its affairs as a subsidiary.

A considerable part of the opinion of the District Court relates to this subject.

It was found that the action of the Rhode Island court in respect to the reorganization proceedings was induced by representations not in accordance with the facts; that the responsibility for inducing that court to so act must rest upon the present plaintiff, Emerson, and Gardner; and that their attempt to justify their representations concerning the Walpole Company's connection with the plan of reorganization submitted by them to court was without success.

In reaching the conclusion that the Walpole Company never became a party to the reorganization scheme approved by the Rhode Island court, and never became the owner of a majority of the common stock of the Consumers' Company, or responsible for the action of Baldwin and Gleason, the District Court apparently was of the opinion that upon the part of Emerson, Gardner, Baldwin, and perhaps others, there was a lack of good faith and of full disclosure to the directors of the Walpole Company of the reorganization scheme.

In regard to an issue of 200 shares of stock of the Consumers' Company in certificates of 50 shares each to Baldwin, Gleason, Dunbar, and Gardner, the District Court expressed the opinion that this amounted to a fraud upon the Consumers' Company, since it had not authorized it.

Although there was no formal action of the board of directors of the Walpole Company assenting to the reorganization plan, there is a strong argument for the contention that there was informal assent to the plan. The publicity of the proceedings in the Rhode Island court, and the subsequent long-continued transaction of the business of the Consumers' Company and the keeping of its books by the Walpole Company's employés at the office of the Walpole Company, the inclusion of the Consumers' Company, in a report of the condition of subsidiaries made to a directors' meeting of the Walpole Company, and a large number of acts done apparently in pursuance of the reorganization plan, seem to be inconsistent with a finding that there was a dishonest intention to conceal or misrepresent the relation between the companies as understood by the promoters of the reorganization plan.

It must be noticed that though in the plan the Walpole Company was expected to arrange to finance the new Consumers' Rubber Company, and to give it the benefit of the Walpole's buying and selling facilities, it was not required to bind itself to advance new capital to the company, or to do more than give it the services of its office force, and possibly to pay a sum sufficient to pay a dividend of 17 per cent. to non-assenting creditors of the old company, who chose to accept this dividend rather than join with the majority of creditors in taking preferred stock in the reorganized company.

We cannot agree that the contention by the plaintiff, Emerson, that the Walpole Company had fully assented to the reorganization plan, and acted with full understanding in accordance therewith, is made otherwise than in good faith. The proofs that the Consumers' Company was treated as a subsidiary of the Walpole Company are numerous and strong enough, at least to negative any lack of good faith in the plaintiff's contention that the Walpole Company had in fact assumed such full management of the Consumers' Company as to become responsible for its mismanagement, in case mismanagement were proved. Upon this view of the case the question of good faith in the transfer of the 200 shares of stock was a question between the Walpole Company and the transferees, rather than between them and the Consumers' Company; and upon the record we do not find sufficient reason for imputing to those who made the transfer an intention to defraud the Consumers' Company of shares of its common

stock. Whether there was an unauthorized appropriation of stock to which under the reorganization plan, the Walpole Company would have been entitled, is a question that was not in issue, and there appears to be no sufficient reason for a finding of bad faith in respect to that transaction.

[2] But as we have found insufficient evidence of mismanagement, which disposes of the claim for damages, and as the evidence bearing upon the question whether the Walpole Company accepted the position of majority stockholder of the Consumers' Company, and assumed its management, was doubtful and conflicting, rather than clear and convincing, and the master and District Court both found that the Walpole Company did not accept such position and assume such management, we do not feel justified in reversing the finding.

[3] As we accept the decision of the District Court that during the period when Baldwin was treasurer and manager of both companies, and when, as appellee's brief states, the financial affairs of both corporations were controlled by Baldwin, the Consumers' Company was independently managed, so that its relation to the Walpole Company was merely that of debtor, and so that Baldwin, as treasurer of the Consumers' Company, had authority to apply its funds in payment of its obligations to the Walpole Company, this decision must be given due effect upon consideration of the second claim for an equitable lien.

The plaintiff claims a lien upon funds now in the hands of the receiver of the Walpole Company, amounting to $18,560, as wrongfully taken from the Consumers' Company by the Walpole Company. Whether the receiver of the Walpole Company has funds in his hands which belong to the trustee in bankruptcy of the Consumers' Company, representing its general creditors, is not merely a question of a settlement of accounts between the two companies. It is rather a question of the right of the Walpole Company to take for itself assets of the Consumers' Company and apply them towards the extinguishment of its claim, and of the right of the referee in bankruptcy to receive this fund for the general benefit of creditors, including the Walpole Company.

The plaintiff contends that the right of the Walpole Company to this fund is no greater than that of other creditors, and that it is entitled only to its pro rata share on an equality with other creditors.

Upon the failure of the Atlantic National Bank, April 14, 1913, Baldwin took all the checks and funds of the Consumers' Company and indorsed them to the Walpole Company. A large part of this was expended for the benefit of the Consumers' Company. Between the failure of the Atlantic Bank on April 14, 1913, and the bankruptcy of the Consumers' Company on July 31, 1913, the funds of the Consumers' Company so taken amounted to $116,572.15. So long as Baldwin continued to be the treasurer of the Consumers' Company and to apply its funds to meet its obligations to the Walpole Company, it is possible to regard this application of funds as the voluntary act of the Consumers' Company, and not as a wrongful appropriation by the Walpole Company.

A fact of great importance upon this question of equitable lien, however, is that upon July 10, 1913, Baldwin resigned as treasurer of the

Consumers' Company, and thereafter was wholly without authority to direct the application of funds coming in to the Consumers' Company to the reduction of the open account with the Walpole Company, or to the payment of any of its creditors.

It appears that after Baldwin's resignation, Bunker, an assistant treasurer and director of the Walpole Company, continued to indorse the paper belonging to the Consumers' Company, and thereby took Consumers' funds to the amount of $13,919.16. The District Court disposed of this question by holding that Bunker did so under Baldwin's instructions, and that his acts are to be regarded as if done by Baldwin or Gleason, and as permitted by acquiescence of the Consumers' other officers, whoever they may have been at that time.

With this we are unable to agree. Baldwin's authority, and with it any delegated authority, ceased upon his resignation.

A notice for a stockholder's meeting of the Consumers' Company upon July 15, 1913, was issued under date of July 3, 1913. At the meeting on July 15, 1913, which, though five days later than Baldwin's resignation, was for consideration of matters of which notice was given seven days before his resignation, a heated discussion occurred over Baldwin's taking over the accounts of the Consumers' Company after the failure of the Atlantic Bank, as well as over his conduct in selling out the stock of goods at a large sacrifice.

[4] That Gleason, the president of the Consumers' Company, and a vice president and director of the Walpole Company, and who had oversight of the Consumers' Company's manufacturing, was authorized to succeed Baldwin in authority as financial manager, or that he did in fact assume to authorize Bunker to succeed Baldwin and to continue to direct the application of the Consumers' Company's funds, does not appear. On the contrary, Gleason testified that he had nothing to do with the financial end of the business of either the Walpole Company or the Consumers' Company, and also said: "I don't worry about the financial part. I was concerned in the manufacturing. Baldwin was to take care of the financial end." Also that he did not know of the details of the Walpole Company taking the Consumers' funds after the failure of the Atlantic Bank; that he knew Baldwin had some little financing to do, but just how it was done he did not know; that he did not know whether the Walpole was taking Consumers' funds, or vice versa. From a reading of his entire testimony, it appears that he had so little knowledge of Baldwin's methods that his failure to intervene after Baldwin's resignation cannot be regarded as amounting to an adoption or authorization of a continuation of Baldwin's methods by Bunker.

It was found by the District Court that it was no doubt true that the disposition made of the Consumers' funds after April 14, 1913, was unjustified by the by-laws of the company. Gleason's evidence is inconsistent with the finding that it was directed or authorized by him. Acquiescence implies knowledge (Pence v. Langdon, 99 U. S. 578, 581, 25 L. Ed. 420), and Gleason testified that he did not have knowledge.

Bunker testified that he had never been an officer nor assistant treasurer of the Consumers' Company, nor on its pay roll; that indorsements were placed on Consumers' checks by Baldwin's direction. That

he was otherwise authorized or directed, or that any officers of the Consumers' Company had such knowledge of his acts that noninterference after Baldwin's resignation amounted to acquiescence, is not shown.

[5, 6] While we think that the plaintiff's characterization of these indorsements of the Consumers' Company's paper as "Bunker's forged indorsements" is not justified, it is proper to say that they were unauthorized and did not change the title to the paper so indorsed, nor to its proceeds. We are of the opinion that the plaintiff has proved that the proceeds of the paper thus indorsed, without authority, by Bunker to the Walpole Company were deposited in the name of the Walpole Company in the Industrial Trust Company of Providence, and that they came into the hands of the receiver of the Walpole Company. As the title to this paper was not changed by the unauthorized indorsements, so the title to the proceeds was not changed. The Walpole Company, after Baldwin's resignation, was without authority, express or implied, to apply these funds, and merely as a creditor had no right in these funds which was greater than the right of other creditors now represented by the plaintiff as trustee in bankruptcy. The mere unauthorized possession of the funds gave the Walpole Company no right to apply them to the payment of its own claims to the prejudice of other creditors.

The decree of the District Court, in so far as it dismisses the plaintiff's claim for damages for mismanagement and holds that the Walpole Company did not accept the position of majority stockholder of the Consumers' Company and assume its management, is affirmed; but in so far as it dismisses the plaintiff's claim for an equitable lien upon the sum of $13,919.16, the proceeds of paper indorsed in the name of Consumers' Rubber Company by Fay L. Bunker, after July 10, 1913, is reversed. In other respects the decree is affirmed, and the case will be remanded to that court for further proceedings consistent with this opinion. The appellant recovers costs of appeal.

## On Petition for Rehearing.

PER CURIAM. The petition for a rehearing sets forth nothing that we had not fully considered. The opinion points out that the question whether the receiver of the Walpole Company has funds belonging to the trustee in bankruptcy of the Consumers' Company is a question not of settlement of accounts between the two companies, but of the right to specific assets; the proceeds of paper indorsed by Bunker, who never in any sense was the employé of the Consumers' Company, either before or after Baldwin's resignation. That Baldwin, before his resignation, used Bunker as his personal assistant, and directed him to perform certain of Baldwin's duties as treasurer of the Consumers' Company, did not make Bunker the agent of the Consumers' Company or vest him with any authority which held over after Bunker's resignation.

As a large part of the testimony relating to the claim for damages related also to the question of the general relations between the companies, and thus to the question of an equitable lien, it seems proper in the present case to follow the usual rule and award costs to the prevailing party, even though he does not wholly prevail.

Petition for rehearing denied.