# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 18, 2015        Decided September 18, 2015

No. 14-1049

UC HEALTH,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with 14-1193

———

On Petition for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board

———

*Kerry P. Hastings* argued the cause and filed the briefs for petitioner.

*Kellie Isbell*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *Richard Griffin, Jr.*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Ruth E. Burdick*, Supervisory Attorney.

Before: GRIFFITH, *Circuit Judge*, and EDWARDS and SILBERMAN, *Senior Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

Concurring opinion filed by *Senior Circuit Judge* EDWARDS.

Dissenting opinion filed by *Senior Circuit Judge* SILBERMAN.

GRIFFITH, *Circuit Judge*:

In *NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014), the Supreme Court determined that the National Labor Relations Board lacked authority to act during the time that three of its five members held office via appointments that violated the Recess Appointments Clause. This petition for review asks whether a Regional Director of the Board had authority to conduct a union election and certify its result during that same time. We conclude that the Regional Director maintained his authority and therefore deny the petition for review.

I

A

Section 3(a) of the National Labor Relations Act (NLRA) calls for a National Labor Relations Board made up of five members who are appointed by the President with the advice and consent of the Senate. 29 U.S.C. § 153(a). The Board has two main functions under the NLRA. Its quasi-judicial function involves deciding whether particular conduct violates the provisions of the Act that bar unfair labor practices. *Id*. §§ 158, 160. The Board also has the primary responsibility for

directing and holding representation elections by which employees may choose to designate representatives for purposes of collective bargaining. *Id.* § 159(b), (c). Representation proceedings differ from unfair labor practice proceedings in that they may only be reviewed in a court of appeals when they are relevant to the court's review of an unfair labor practice proceeding. *See Am. Fed'n of Labor v. NLRB*, 308 U.S. 401, 409 (1940). The Act authorizes the Board to delegate to Regional Directors the authority to direct representation elections and certify the results. 29 U.S.C. § 153(b). The Board first delegated its authority over representation proceedings to the Regional Directors in 1961. *See* 26 Fed. Reg. 3911 (May 4, 1961). Regional Directors have been responsible for administering and certifying the results of representation elections in their particular regions ever since.

In what turns out to be a critical distinction for the purposes of this challenge, the statute preserves for the Board the power to review "any action of a regional director" taken pursuant to that delegation, should a party object. 29 U.S.C. § 153(b). Thus, though the Board may empower Regional Directors to oversee representation elections, the terms of the delegation authorized under the Act provide that no Regional Director's actions are ever final on their own; they only become final if the parties decide not to seek Board review or if the Board leaves those actions undisturbed. *Id.*

The Act separately permits the Board to delegate "any or all of the powers which it may itself exercise" to panels made up of three or more of its members. 29 U.S.C. § 153(b). When such a panel is created, the Act provides that two of its members make up a quorum of that group. *Id.* This provision allows the Board to process cases more quickly by spreading them across more panels. Moreover, it allows the Board to

continue to function without requiring the attendance of all members. Should two of the five members' terms expire, the Board can continue to act despite the vacancies, while waiting for Congress to appoint new members. Nevertheless, the statute mandates that "three members of the Board shall, at all times, constitute a quorum of the Board." *Id.*

Between August 2010 and January 3, 2012, three of the Board's five members' terms expired and the Senate refused to confirm any of the President's nominees to fill the vacancies, leaving the Board without a quorum and therefore unable to act. Claiming authority under the Recess Appointments Clause, *see* U.S. Const. art. II, § 2, cl. 3, the President named three individuals to the Board during a three-day break between *pro forma* Senate sessions, but the Supreme Court held those appointments unconstitutional in *Noel Canning*, 134 S. Ct. 2550. No Senate-confirmed appointees were sworn in until August 5, 2013. In the interim, Regional Directors continued to hold elections and certify the results, relying upon the Board's previous delegation of authority.

B

UC Health is a nonprofit corporation that operates a hospital and provides inpatient and outpatient medical care near the University of Cincinnati in Ohio. In March 2013, while the Board lacked a quorum, the UC Health Public Safety Union filed a petition with the Board seeking to represent a unit of security officers employed by the company. UC Health and the Union entered into a Stipulated Election Agreement that identified the appropriate bargaining unit and established that the Regional Director would supervise a secret-ballot election following the Board's regulations. Under those regulations, if either party files

timely objections to the election, it is entitled to plenary review by the Board of any decision of the Regional Director addressing those objections. 29 C.F.R. § 102.67(c). If no objections are filed, the Regional Director "shall" certify the results. *Id*. § 102.69(b).

The Regional Director held the representation election on April 16, 2013, and the Union prevailed by a small margin. The Regional Director certified the results without objection from UC Health or the Union on April 24. Shortly thereafter, the Union requested that UC Health bargain, but the company refused. Citing that refusal to bargain, the Acting General Counsel charged UC Health with an unfair labor practice. The company defended itself on the ground that the Regional Director had acted without authority because the Board lacked a quorum at the time of the election.

The Board granted summary judgment to the Acting General Counsel, finding that the company's argument was untimely because it had not been made during the representation proceedings. *See UC Health and UC Health Public Safety Union*, 360 N.L.R.B. No. 71 (2014). And even if not waived, the Board concluded that UC Health's argument was without merit because the Board had delegated authority over representational proceedings to the Regional Directors in 1961; "[p]ursuant to this delegation, NLRB Regional Directors remain vested with the authority to conduct elections and certify their results, regardless of the Board's composition at any given moment." *Id*. at *1 n.2. Therefore, the Board determined that the election was valid and UC Health had committed an unfair labor practice by refusing to bargain with the Union. *Id*. at *2-3. UC Health filed a petition for review in this court. We have jurisdiction under 29 U.S.C. § 160(e), (f). Absent plain meaning to the contrary, a court is obliged to defer to an agency's reasonable

interpretation of its statutory jurisdiction pursuant to the familiar *Chevron* doctrine. *City of Arlington v. FCC*, 133 S. Ct. 1863, 1870-71 (2013).

## II

The sole question before us is whether the Regional Director had authority to hold the representation election and certify its results when the Board lacked a quorum. We hold that he did.

## A

The Board argues that we need not address whether the Regional Director had the necessary authority because UC Health has waived its challenge by failing to raise its objection to the Regional Director's authority at the representation proceeding. "[A]s a general proposition, the applicable case law emphasizes the need for parties seeking judicial review of agency action to raise their issues before the agency during the administrative process in order to preserve those issues for review." *Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1148 (D.C. Cir. 2005). The NLRA states that "[n]o objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e). And under the Board's practice, "any issues that may be presented during the representation proceeding must be offered there." *Pace Univ. v. NLRB*, 514 F.3d 19, 23 (D.C. Cir. 2008). Thus, the Board claims, UC Health's objection to the Regional Director's authority comes too late.

We have consistently held, however, that challenges to the composition of an agency can be raised on review even when they are not raised before the agency. *See Noel Canning v. NLRB*, 705 F.3d 490, 497 (D.C. Cir. 2013), *aff'd on other grounds*, 134 S. Ct. 2550 (2014); *Mitchell v. Christopher*, 996 F.2d 375, 378-79 (D.C. Cir. 1993) (recognizing an exception allowing parties to "raise[] for the first time on review . . . challenges that concern the very composition or 'constitution' of an agency"). Since this challenge directly involves the question of whether the Board's lack of a quorum stripped the Regional Directors of power, UC Health may make it and we may review it.

The Board also asserts that UC Health may not challenge the Regional Director's authority because the company voluntarily entered into the Stipulated Election Agreement with the Union, and therefore agreed to let the Regional Director supervise the election. According to the Board, the agreement is a contract binding on both parties: UC Health accepted the Regional Director's authority to oversee the election and, in exchange, received important procedural benefits, including a prompt election. Because UC Health explicitly agreed to the terms of the election, the Board insists that the company cannot challenge one of those terms now. We reject this argument. UC Health did not expressly give up the challenge it brings now when it executed the Agreement; it merely signed a form agreement providing that the Board's regulations would govern the election. Indeed, when UC Health entered the Stipulated Election Agreement, no one knew whether Congress might confirm the President's appointments and obviate the quorum issue by the time the representation election in this case took place. And for that matter, UC Health could not have known with any certainty that the Board had no quorum even without Senate approval for the President's appointments until the Supreme Court

handed down its decision in *Noel Canning* fourteen months after the election. We will not hold UC Health responsible for failing to see the future. And as we have already said, "challenges that concern the very composition or 'constitution' of an agency" can "be raised for the first time on review," even if the objecting party failed to make that objection at the appropriate time below. *Mitchell*, 996 F.2d at 378-79. Perhaps some objections to agency action could be abandoned by explicit acceptance of the agency's authority to act under the statute. But we need not decide that here because UC Health did not expressly abandon anything at all in the Stipulated Election Agreement, and we will not hold it responsible for failing to preserve expressly an argument the substance of which had not yet arisen. *See San Miguel Hosp. Corp. v. NLRB*, 697 F.3d 1181, 1187 n.7 (D.C. Cir. 2012).

B

UC Health's challenge to the Board's decision that the Regional Director had authority to conduct the election fails on the merits.

1

The Board interprets the relevant provision of the NLRA to permit Regional Directors to continue exercising their delegated authority while the Board lacks a quorum. We consider the validity of the Board's interpretation of the Act under "the familiar two-step *Chevron* test."[1] *Int'l Alliance of*

---

[1] The dissent contends that *Chevron* is inapplicable in this case because the Board opinion never relied on *Chevron* nor stated explicitly that the statute is ambiguous. Dissent at 5-6. But our precedent does not require such statements. In *Arizona v.*

*Theatrical & Stage Emps. v. NLRB*, 334 F.3d 27, 31 (D.C. Cir. 2003). At step one we ask "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). If Congress has addressed whether Regional Directors may continue to act in the absence of a Board quorum, "that is the end of the matter[,] for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id*. at 842-43. If the statute is ambiguous, we move to *Chevron*'s second step and ask whether the Board's interpretation is "a permissible construction of the statute" to which we must defer. *Id*. at 843.

---

*Thompson*, 281 F.3d 248 (D.C. Cir. 2002), and other cases the dissent cites, we refused to defer to an agency when the agency itself made clear that it believed the interpretation on which it relied was compelled by Congress and did not represent its own view of an ambiguous statute. *See id.* at 254. Here, although the Board's explanation of its interpretation of the statute is brief, it contains nothing suggesting that it viewed its interpretation as reflecting Congress's unambiguously expressed intent. Instead, the Board's reasoning rested on its interpretation of the extent of its prior delegation of authority to the Regional Director, backed by its reading of *New Process Steel, L.P. v. NLRB*, 560 U.S. 674 (2010), and other case law. Of course, "[l]ike other administrative agencies, the NLRB is entitled to judicial deference when it interprets an ambiguous provision of a statute that it administers." *ITT Indus., Inc. v. NLRB*, 251 F.3d 995, 999 (D.C. Cir. 2001) (internal quotation marks and citations omitted). And we note that even if we agreed with the dissent that the Board did not exercise its own judgment here, we would not in any case rule for UC Health; because we conclude that the statute is ambiguous, "[t]he law of this circuit [would] require[] . . . that we withhold *Chevron* deference and remand to the agency so that it can fill in the gap." *PDK Labs., Inc. v. DEA*, 362 F.3d 786, 798 (D.C. Cir. 2004).

At the first step of *Chevron*, we conclude that the statute is silent on the issue of the Regional Director's power to act when the Board lacks a quorum. The relevant text of the statute provides:

> The Board is authorized to delegate to any group of three or more members any or all of the powers which it may itself exercise. The Board is also authorized to delegate to its regional directors its powers . . . to direct an election or take a secret ballot . . . and certify the results thereof, except that upon the filing of a request therefor with the Board by any interested person, the Board may review any action of a regional director delegated to him under this paragraph, but such a review shall not, unless specifically ordered by the Board, operate as a stay of any action taken by the regional director. A vacancy in the Board shall not impair the right of the remaining members to exercise all of the powers of the Board, and three members of the Board shall, at all times, constitute a quorum of the Board . . . .

29 U.S.C. § 153(b). In its adjudication of the unfair labor practice charge against UC Health, the Board explained that it interpreted the NLRA to permit the delegation of authority to the Regional Director and concluded that "[p]ursuant to this delegation, NLRB Regional Directors remain vested with the authority to conduct elections and certify their results, regardless of the Board's composition at any given moment." *UC Health*, 360 N.L.R.B. No. 71 at *1 n.2.

UC Health argues that the structure of the statute forbids this interpretation. In its view, the three-member quorum requirement applies to the activities of not just the Board but also of the Regional Directors. UC Health points out that the statute implements the quorum requirement in the sentence

immediately succeeding the sentence that authorizes the Board to delegate authority to the Regional Directors. This ordering, UC Health argues, expressly limits actors wielding delegated Board authority precisely as the Board itself is limited: Neither may act unless the Board has a quorum.

We are not convinced that the statutory text and structure unambiguously require this interpretation. The plain language of the Act applies the quorum requirement to the Board's authority to act, not the Regional Directors' ability to wield delegated authority. To the contrary, the structure of the statute supports the Board's interpretation just as well as it might support UC Health's construction. The first sentence of the provision empowers the Board to delegate its final, plenary authority to panels of its own members. The second sentence authorizes the Board to delegate to the Regional Directors the authority to oversee elections, provided that the Regional Directors' decisions always remain subject to Board review if the parties dispute them. And the third sentence specifies that the Board can only exercise its plenary, final authority—whether to adjudicate unfair labor practice charges or to review the decisions of Regional Directors in representation elections, whether wielded by the Board as a whole or by three-member delegee panels—if the Board has at least three validly appointed members. Thus, though the statute cabins the Board's own ability to function without a quorum, it says nothing about what effect the loss of a quorum has on pre-existing delegations of authority to the Regional Directors.

2

Because the statute is ambiguous on this point, we owe deference to the Board's interpretation, *City of Arlington*, 133 S. Ct. at 1870-71, if it is reasonable and consistent with the

statute's purpose, *see Indep. Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638, 643 (D.C. Cir. 2000).

We think the Board's interpretation easily meets this requirement. The Board explained that the NLRA "expressly authorize[s] the delegation" of power to the Regional Director, that the Board acted under that authority and "delegated decisional authority in representation cases to Regional Directors," and that "[p]ursuant to this delegation, NLRB Regional Directors remain vested with the authority to conduct elections and certify their results, regardless of the Board's composition at any given moment." *UC Health*, 360 N.L.R.B. No. 71 at *1 n.2. This is a sensible interpretation that is in no way contrary to the text, structure, or purpose of the statute. Though the dissent suggests we have failed to examine the language or structure of the statute, Dissent at 5, we have already explained in our step-one analysis that the Board's interpretation gives effect to each part of the statutory provision. Moreover, allowing the Regional Director to continue to operate regardless of the Board's quorum is fully in line with the policy behind Congress's decision to allow for the delegation in the first place. Congress explained that the amendment to the NLRA that permitted the Board to delegate authority to the Regional Directors was "designed to expedite final disposition of cases by the Board." *See* 105 Cong. Rec. 19,770 (1959) (statement of Sen. Barry Goldwater). Permitting Regional Directors to continue overseeing elections and certifying the results while waiting for new Board members to be confirmed allows representation elections to proceed and tees up potential objections for the Board, which can then exercise the power the NLRA preserves for it to review the Regional Director's decisions once a quorum is restored. And at least those unions and companies that have no objections to the conduct or result of an election can agree to accept its outcome without any Board

intervention at all. The Board's interpretation thus avoids unnecessarily halting representation elections any time a quorum lapses due to gridlock elsewhere.

The Board's interpretation of the statute reads every clause of the statutory provision harmoniously, and, as a policy matter, it ensures adequate protection for the rights of employers and unions alike. It is eminently reasonable. Therefore we defer to the Board's interpretation under *Chevron* step two and uphold the Regional Director's authority to direct and certify the union election even while the Board itself had no quorum.

3

UC Health argues, however, that the Board's interpretation of the statute is foreclosed by our decision in *Laurel Baye Healthcare of Lake Lanier, Inc. v. NLRB*, 564 F.3d 469 (D.C. Cir. 2009). We conclude that UC Health is wrong. *Laurel Baye* has no direct application here because it addressed different statutory questions involving different and highly distinguishable statutory language and altogether different facts. Neither the holding nor the reasoning of that case forbids the Board's interpretation of its authority here, to which we owe deference.

*Laurel Baye* addressed the lawfulness of the Board's effort to evade the quorum requirement imposed on its own activities, not the status of authority previously delegated to the Regional Directors once the Board loses a quorum. In *Laurel Baye*, we considered the consequence of events beginning in December 2007, when the Board had four members, two of whom had terms that expired at the end of the month. With their departures, the Board would no longer satisfy the three-member quorum requirement the NLRA

imposes "at all times," *see* 29 U.S.C. § 153(b). In an effort to overcome this impediment, the four-member Board delegated its plenary, final authority to a panel of three members made up of the two members whose terms continued into 2008 and one of the members whose term would soon expire. When the outgoing members finished their service at the end of 2007, the Board had a total of only two members and no longer met the overall three-member quorum requirement. By the same token, the panel to which the Board had delegated its authority was composed only of the two remaining members of the Board. The Board reasoned that because the NLRA imposes a separate, lower quorum requirement for three-member panels, those two remaining members made up a quorum of the delegee panel. Thus, even though the Board itself was paralyzed for want of a quorum, the Board believed that those two remaining members could still act in the name of the three-member panel to which they belonged and could wield the plenary, final authority the Board had delegated to that panel before the Board's total membership fell below the "at all times" three-member quorum requirement of 29 U.S.C. § 153(b).

In *Laurel Baye*, we rejected this tactic, concluding that the plain language of the statute had a single, "unambiguous" reading that foreclosed the Board's interpretation.[2] 564 F.3d

---

[2] Though we did not indicate in so many words that this conclusion constituted a *Chevron* step-one holding, we did without question identify an "unambiguous" reading of the statute regarding the Board's authority to evade the quorum requirement on its own activities that foreclosed any inconsistent Board interpretations. *Laurel Baye*, 564 F.3d at 473; *see also id.* (explaining that the statutory text "clearly require[d]" one result); *id.* ("Congress provided unequivocally" that the Board's interpretation was

at 473. We held that the Board could never adjudicate unfair labor practice charges with fewer than three active members because the NLRA provides that the Board must satisfy the three-member quorum requirement "*at all times*." *Id.* at 472 (quoting 29 U.S.C. § 153(b)) (emphasis in *Laurel Baye*). "The Board quorum requirement therefore must still be satisfied, regardless of whether the Board's authority is delegated to a group of its members." *Id.* And when the Board has delegated its authority to a panel of three that meets its own two-member quorum requirement, that panel has authority to act on behalf of the Board only so long as the Board has authority to act as well—that is, when the Board has at least three members. "[T]he Board cannot by delegating its authority circumvent the statutory Board quorum requirement, because this requirement must always be satisfied." *Id.* at 473. "The delegee group's delegated power to act [therefore] ceases when the Board's membership dips below the Board quorum of three members." *Id.* at 475. The Board's approach—allowing a delegee panel of two members to wield plenary Board authority even if those two members comprised the entire active Board membership—would "allow the Board to reduce its operative quorum to two without further congressional authorization." *Id.* Thus we found that under the plain meaning of the statute a three-member delegee panel acting "*on behalf* of the Board" may only do so when the Board satisfies its quorum requirement. *Id.* (emphasis added).

Separately, we noted that our conclusion was bolstered by analogy to common-law agency principles. According to

foreclosed); *id.* at 475 (explaining that the delegated authority of a Board panel was "necessarily limited" by the NLRA's quorum requirement); *id.* at 476 (noting that "[a]ny change to the statutory structure must come from the Congress, not the courts").

the Restatement (Third) of Agency, we explained, "an agent's delegated authority terminates when the powers belonging to the entity that bestowed the authority are suspended" and "is also deemed to cease upon the resignation or termination of the delegating authority." *Laurel Baye*, 564 F.3d at 473. "The statute confers no authority" on a delegee panel, but only "permits" the Board to create such a committee. *Id.* "The only authority by which the committee can act is that of the Board," and "[i]f the Board has no authority, it follows that the committee" cannot exercise final authority in the place of the Board, either. *Id.*

The Supreme Court took up the same question regarding the Board's authority to act without a quorum in *New Process Steel, L.P. v. NLRB*, 560 U.S. 674 (2010), and reached a similar conclusion based on different reasoning. The Supreme Court's interpretation of the plain terms of the statute led it to conclude that the Board's powers must "be vested at all times in a group of at least three members." *Id.* at 680.[3]

---

[3] The dissent suggests that we may never apply *Chevron* deference to interpretations of section 3(b) because the Court did not rely on *Chevron* at all in *New Process Steel*. Dissent at 6. There are a number of cogent explanations that might explain why the Court did not do so. Perhaps the Court simply concluded that the Board was due no deference under any standard because the text of the statute decided the question. Perhaps the Court viewed the Board's entitlement to *Chevron* deference as forfeited because the Board had neglected to request deference at the court of appeals. Perhaps the Court believed that the Board was not entitled to deference because it relied on an OLC memorandum rather than interpreting the statute itself. But the dissent offers no reason at all justifying its contrary conclusion that *New Process Steel* prohibits the application of *Chevron* to this precise section in any future case. We will not take the extraordinary step of removing a provision

The Court specifically declined to consider the discussion of agency law in *Laurel Baye*, explaining that "failure to meet a quorum requirement [does not] necessarily establish that an entity's power is suspended so that it can be exercised by no delegee. . . . [The] conclusion that the delegee group ceases to exist once there are no longer three Board members to constitute the group does not cast doubt on the prior delegations of authority to nongroup members, such as the regional directors . . . ." *Id.* at 684 n.4. Such prior delegations to nongroup members involved a separate question that the Court expressly did not address.

*Laurel Baye* does not control this case because it confronted an entirely different situation based on different statutory language and policy considerations, and neither could have nor did reach the question we face here. Therefore nothing in that opinion alters our conclusion that we owe deference to the Board's reasonable interpretation of the statute. As noted above, in *New Process Steel* the Supreme Court highlighted the distinction between the two types of authority the Board may delegate to different actors. The Board may delegate its plenary, final authority to decide cases to a subgroup of its own members. It may also delegate nonfinal authority to supervise elections, subject to review and approval by the Board itself, to "nongroup" actors like the

---

from an agency's interpretive reach without any basis for such a holding. Of course, even if *New Process Steel* did somehow foreclose *Chevron* deference, that unusual result would apply only to the issue presented in that case: the authority of Board delegee panels, not the authority of the Regional Directors. And even if *New Process Steel* did somehow apply to the issue before us, we would nonetheless be left with ambiguous statutory text.

Regional Directors. *New Process Steel*, 560 U.S. at 684 n.4. This distinction between forms of delegated authority is crucial. *Laurel Baye* considered only whether plenary, final authority delegated to panels of the Board's own members could survive when the Board had no quorum; we concluded that the delegation in question could not survive because it was precluded by the plain meaning of the statutory provision in question. Here, we must consider a different question, arising from a different clause of the statute, involving different analytical considerations: whether the statute vitiates nonfinal authority already delegated to individuals outside the Board's membership when the Board loses its quorum. As the Supreme Court expressly acknowledged, the two questions are distinct, and the answer to one has no necessary logical relationship to the answer to the other.

UC Health insists, however, that the agency discussion in *Laurel Baye* prohibits the Board from interpreting the statute to authorize Regional Directors to continue acting when the Board has no quorum. We disagree. In *Laurel Baye*, we analyzed the plain language of the statute and found that it prohibited the Board from employing the delegation at issue there without giving any deference to the Board at all. The discussion of agency principles in that case confirmed our interpretation of the statute's plain meaning. Here, because the text is ambiguous, we must defer to the Board's reasonable interpretation. For that reason, *Laurel Baye*'s agency analysis could only possibly be relevant here if it rendered the Board's interpretation unreasonable with the same clarity that the plain language of the statute, reinforced by the principles of agency law, foreclosed the Board's effort in *Laurel Baye* to delegate its plenary, final authority even when it had no quorum. But there is a fundamental difference in the nature of the authority delegated in these two cases. Therefore we conclude that *Laurel Baye*'s agency discussion

is simply off the mark in this case. A delegee panel, wielding the Board's plenary, final authority, speaks on the Board's behalf and in its place. The Regional Directors never similarly occupy the Board's role as a final decisionmaker. Indeed, the statute and the Board's own regulations expressly reserve for the Board the power to review and reverse any determination a Regional Director makes. 29 U.S.C. § 153(b); 29 C.F.R. § 102.67(c). [4] Therefore the statute makes clear that the delegation at issue here does not implicate any of the concerns that motivated us to draw on agency law in *Laurel Baye*. Because the relationship between the Board and the Regional Directors is so different from the relationship between the Board and its delegee panels, we do not see how the agency analysis in *Laurel Baye* sheds any light at all on the authority the statute permits the Board to delegate to the Regional Directors or when that authority expires. [5]

---

[4] The dissent claims that the right to appeal a Regional Director's decision is lost if the Board lacks a quorum. Dissent at 2 & n.1. This is incorrect. Even if the Board has no quorum when a party appeals a Regional Director's decision, nothing in the regulation precludes the Board from taking up the objection once it regains a quorum. *See* 29 C.F.R. § 102.67(c). The dissent suggests that bad consequences might arise while appeals of Regional Director determinations remain pending. This claim finds no support in the record. In any event, considerations such as these shed no light on the proper reading of the statute.

[5] The dissent apparently takes issue with the fact that the Board did not highlight this distinction in its brief. Dissent at 4. But of course "[p]arties cannot waive the correct interpretation of the law by failing to invoke it." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2101 n.2 (2015) (Thomas, J., concurring in the judgment in part and dissenting in part) (citing *EEOC v. FLRA*, 476 U.S. 19, 23 (1986) (*per curiam*)).

The important distinction between the final authority delegated in *Laurel Baye* and the nonfinal authority delegated here is all the more clear in light of the materials on which we relied in our agency analysis in *Laurel Baye*. All the sources we cited dealt with an agent who had authority to speak finally on the principal's behalf with permanent legal effect. *See, e.g.*, Restatement (Third) of Agency § 3.07(4) (2006) (explaining that an agent's actual authority to affect its principal's legal relations expires when the principal's power to act is suspended); 2 William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations § 504 (2008) (same, with respect to the resignation or termination of the delegating authority); *Id.* § 421 ("If there are fewer than the minimum number of directors required by statute, [the remaining directors] cannot act as a board."); *Emerson v. Fisher*, 246 F. 642, 648 (1st Cir. 1918) (holding that a corporate treasurer's delegee lacks authority to disburse corporate funds after the treasurer himself resigns). In every case the cited rule prohibits an agent from taking some final action on behalf of its principal at a time when the principal could not act itself. And indeed, the ability to stand in the principal's place is fundamental to the existence of an agency relationship at all. *See* Restatement (Third) of Agency § 1.01 cmt. c ("[T]he concept of agency posits a consensual relationship in which one person . . . acts as a representative of or otherwise acts on behalf of another person with power to affect the legal rights and duties of the other person."). For example, in *Emerson*, an assistant corporate treasurer continued to sign checks drawn on corporate funds in the treasurer's name after the treasurer had resigned. 246 F. at 648. The First Circuit found that the assistant treasurer could not take final actions in the place of the treasurer when no individual held that office; wielding the principal's authority and signing checks in his stead was forbidden without a treasurer in place whose authority the assistant could exercise by proxy.

The outcome in *Emerson* and the issues identified in the other authorities we cited in *Laurel Baye* were unmistakably relevant to the issue we confronted in that case. There, the Board had allowed a delegee panel to exercise the Board's plenary, final authority when the Board itself could not act at all. The panel's judgment was as final for the parties as the full Board's determination would have been. Allowing an agent to act in those circumstances was at odds with basic principles of agency law. But those principles have no bearing here. No decision of the Regional Directors is ever final under its own power. Only the acquiescence of the parties or the Board's ratification can give binding force to a Regional Director's determination. Therefore the Regional Directors are not acting "*on behalf* of the Board" in the way that doomed the Board's tactic in *Laurel Baye*. 564 F.3d at 475 (emphasis added). And the agency analysis we expounded in that case is not relevant here for the same reason.

In other words, a Regional Director never has the last say on anything unless a party fails to object. In that event, it is the parties' choice to leave the Regional Director's decisions unchallenged that effectively makes the election final. Otherwise, a Regional Director's decision becomes final only when approved by the Board. Of course, Board review is discretionary even when a party files an objection to a Regional Director's decision. Nonetheless any objection will always be considered by the Board, and it is the Board's action—declining to grant review or granting review and upholding or reversing the Regional Director's decision—that finally commits the Board's imprimatur. Obviously the Board could not consider any objection to a Regional Director's determination when it did not satisfy the NLRA's three-member quorum requirement. But when the Board acts with a quorum to review and approve a Regional Director's

decision, the Board, not the Regional Director, has decided the issue. Unlike in *Laurel Baye*, this delegation does not allow some other actor to stand in the Board's place and wield its authority when it is otherwise statutorily immobilized. Therefore the agency principles that bolstered our statutory conclusion in *Laurel Baye* are as irrelevant in this case as is our discussion there of a different clause of the statute.[6]

---

[6] The dissent suggests that, by declining to consider or adopt the agency analysis in *Laurel Baye*, the Court in *New Process Steel* understood *Laurel Baye* to have implicitly decided the issue this case presents. Dissent at 3. It is far from clear whether it would make any difference if the Court actually expressed a view, in dicta, of the implicit scope of one of our decisions. Even so, we disagree that the Court expressed any such opinion. The Court acknowledged, as have we, that *Laurel Baye* relied on statutory and agency grounds to foreclose the Board's agents from acting when the Board could not act. But the Court did not explain its view of how far *Laurel Baye*'s reasoning necessarily extended any more than *Laurel Baye* itself offered such an explanation. And after all, *New Process Steel*, like *Laurel Baye*, decided a different question from the issue before us here. Whether the agency analysis in *Laurel Baye* necessarily also applies to "nongroup" actors like the Regional Directors was, the Court explained, "a separate question." *New Process Steel*, 560 U.S. at 684 n.4.

Nor do we think the dissent is correct that other circuits' pronouncements militate in favor of extending *Laurel Baye* to reach delegations to the Regional Directors—an issue not raised in that case. Dissent at 3 & n.3. It is true that several other courts since *New Process Steel* have declined to apply the broadest possible reading of our agency analysis in *Laurel Baye* to the distinct question of whether the Board's General Counsel may continue to exercise authority when the Board has no quorum. But the noteworthy point is that these circuits all agree with our fundamental conclusion: The broad, general expressions of common law agency principles stated in the different context of

Indeed, we are all the more persuaded that the Board's interpretation of the statute is reasonable in light of the structural distinction between the final character of its authority to adjudicate unfair labor practice cases and the nonfinal authority to oversee representation elections it may delegate to the Regional Directors. Because any contested decision a Regional Director makes is not final until the Board acts, it is immaterial whether the Board had a quorum at the time the Regional Director conducted the election. To the contrary, when the Regional Directors exercise their delegated authority to oversee elections, they further the policy of the statute by increasing the efficiency with which representation elections are held—irrespective of the Board's status at that time.

For all these reasons, there is nothing in *Laurel Baye* or its broad discussion of principles of agency law that controls the Board's interpretation of its authority in this case. As shown above, the Board's interpretation of its authority was reasonable, and we are bound to defer to the Board's reasonable interpretation of the statute it is charged to administer. *See City of Arlington*, 133 S. Ct. at 1870-71.

*Laurel Baye* are not persuasive in the context of non-Board delegees. We have explained why the fundamental differences between the authority delegated in *Laurel Baye* and the authority delegated to the Regional Directors here render *Laurel Baye* irrelevant. *See* Restatement (Third) of Agency § 1.01 cmt. c ("[T]he concept of agency posits a consensual relationship in which one person . . . acts as a representative of or otherwise acts on behalf of another person with power to affect the legal rights and duties of the other person."). Neither *New Process Steel* nor the circuit cases cited in the dissent erase that structural distinction. In fact, they are all best read to support it.

24

III

For the foregoing reasons, we deny UC Health's petition for review and grant the NLRB's cross-application for enforcement of its order.

EDWARDS, *Senior Circuit Judge*, concurring: The dissent is mistaken in suggesting that if the rationale or logic supporting a decision in one case is stated broadly enough to cover future cases not at issue, the latter cases are necessarily controlled by the earlier case. Were this the law, appellate decisionmaking would be a mischievous enterprise.

\* \* \* \*

It is well understood that "[t]he doctrine of *stare decisis* is of fundamental importance to the rule of law." *Welch v. Tex. Dep't of Highways & Pub. Transp.*, 483 U.S. 468, 494 (1987). *Stare decisis* – to stand by things decided – embraces the principle that each judicial decision is a statement of law (or precedent) that may have binding force in future cases. "*Stare decisis* . . . 'promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.'" *Hohn v. United States*, 524 U.S. 236, 251 (1998) (quoting *Payne v. Tennessee*, 501 U.S. 808, 827 (1991)). "For judges, the most basic principle of jurisprudence is that we must act alike in all cases of like nature" because "[i]nconsistency is the antithesis of the rule of law." *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc) (internal quotation marks omitted).

A judicial decision is viewed as "precedent" when it controls the disposition of a pending case. Whenever a court faces a situation in which a prior judicial decision has some similarity to a pending case, the judges must initially determine the rule established by the decision in the first case, limited by the context in which the judgment was reached. Then the judges must determine whether the rule of the prior case controls the disposition of the pending case. It is easy to subscribe to the goal of *stare decisis*. It is not always easy, however, to determine when a prior case qualifies as controlling precedent. *See* Jeremy Waldron, *Stare Decisis and*

*the Rule of Law: A Layered Approach*, 111 MICH. L. REV. 1 (2012) (discussing applications of *stare decisis*); Ruggero J. Aldisert, *Precedent: What It Is and What It Isn't; When Do We Kiss It and When Do We Kill It?*, 17 PEPPERDINE L. REV. 605 (1990) (same). Nonetheless, there are several important principles that the courts routinely follow in determining the applicability of precedent to the cases before them.

First, "an issue of law must have been heard and decided" in the same or a higher court for a decision to have precedential value with respect to that issue. *Gately v. Massachusetts*, 2 F.3d 1221, 1226 (1st Cir. 1993) (quoting *EEOC v. Trabucco*, 791 F.2d 1, 4 (1st Cir. 1986)). Second, "if an issue is not argued, or though argued is ignored by the court, or is reserved, the decision does not constitute a precedent to be followed" with respect to that issue. *Id.* Third, a judicial decision "attaches a specific legal consequence to a detailed set of facts." *Allegheny Gen. Hosp. v. NLRB*, 608 F.2d 965, 969–70 (3d Cir. 1979). The decision "is then considered as furnishing the rule for the determination of a subsequent case involving identical or similar material facts." *Id.*; *see also United States v. Holyfield*, 703 F.3d 1173, 1177 & n.7 (10th Cir. 2013) (citing *Allegheny*'s definition of precedent approvingly). Fourth, as Chief Justice Marshall explained in his seminal opinion in *Cohens v. Virginia*, 19 U.S. (6 Wheat) 264 (1821):

> It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the court is investigated with care, and considered

in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated.

*Id.* at 399–400.

This last precept – that the force of a general expression enunciated in a prior decision must be limited by reference to its specific context – is so firmly embedded in *stare decisis* jurisprudence that the Supreme Court has called it a "canon of unquestionable vitality." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994). Indeed, the Court has said that it is the "*duty*" of judges "to restrict general expressions in opinions in earlier cases to their specific context." *Int'l Bhd. of Teamsters Local 309 v. Hanke*, 339 U.S. 470, 480 n.6 (1950) (plurality opinion) (emphasis added). *See also, e.g.*, *King v. Morton*, 520 F.2d 1140, 1147 (D.C. Cir. 1975) ("Chief Justice Marshall warned against basing decisions on bare general principles enunciated in other cases. . . . The simple words of the opinions [cited by appellant] are not as important as the contexts in which those cases were decided.").

The obvious point is that the precedential value of a decision is defined by the context of the case from which it arose. If, in light of that context, the decided case is materially or meaningfully different from a superficially similar later case, the holding of the earlier case cannot control the latter.

Determining the proper scope of the rule of a prior decision can be controversial. In his illuminating article on "Stare Decisis and the Rule of Law," Professor Waldron points out that "[l]egal realists and critics are fond of" accusing judicial panels of formulating the rule of prior decisions as they see fit "in order to suit [their] own view[s]

about how the case in front of [them] should be decided." Waldron, *supra*, at 26. He urges that, to avoid this pitfall in decisionmaking, judicial panels should be ever mindful that the rule of law commands them to view precedent "in a responsible spirit of deference." *Id.* I agree.

However, as Professor Waldron notes, the ascertainment of the rule of a prior case and the determination whether the prior case constitutes a binding precedent that controls the disposition of a pending case are nuanced enterprises.

> One case may seem superficially similar to another, but the judge[s on the second panel] may be convinced that there are differences that preclude simply subjecting a subsequent case to the same rule that decided the precedent case. . . . For example, a given statutory provision may apply properly to one case but not another, even though the second is superficially similar to the first; therefore, we "distinguish" the second case. And similarly, the rule that [the first panel] figured out as a basis for [its] decision in the precedent case may not apply to a subsequent case despite superficial similarities. There may be things about the second case that pose a distinct legal problem, which require a new and distinct law-like solution to be figured out by [the second panel] in the form of a rule . . . . To distinguish a case, then, is not just to "come up with" some difference. It is to show that the logic of what [the first panel] figured out does not, despite appearances, apply. It means pointing to some additional problematic feature of the subsequent case that requires additional figuring.

*Id.* at 25–26. Courts routinely follow these principles of precedent application. Looking to the context of the putative controlling decision – the facts, the statutory or constitutional

provisions at issue, the arguments made by the parties and decided or reserved by the court, and the rationale underlying the decision – they determine whether the holding of an existing case controls the outcome of a pending case. *See, e.g.*, *Humphrey's Executor v. United States*, 295 U.S. 602, 626–28 (1935) (distinguishing the pending case from the cited precedent because the situations were "so essentially unlike" each other); *United States v. Thomas*, 361 F.3d 653, 662–63 (D.C. Cir. 2004) (applying precedent selectively to two defendants' cases based on factual similarities and dissimilarities to the prior case), *reinstated following vacatur sub nom. United States v. Cook*, 161 Fed. App'x 7 (D.C. Cir. 2005).

\* \* \* \*

Here, the considerations guiding the application of precedent make clear that, although *Laurel Baye Healthcare of Lake Lanier, Inc. v. NLRB*, 564 F.3d 469 (D.C. Cir. 2009), is "superficially similar" in some respects to the case presently before the court, it does not control the resolution of the legal question presented in this case. First, as Judge Griffith's opinion explains, the facts of *Laurel Baye* are very different from the facts of this case. And facts matter in determining the precedential value of a prior case. *See, e.g.*, *Armour & Co. v. Wantock*, 323 U.S. 126, 132–33 (1944) ("[W]ords of our opinions are to be read in the light of the facts of the case under discussion. . . . General expressions transposed to other facts are often misleading."). Second, just as significantly, *Laurel Baye* did not involve the statutory and regulatory provisions that are principally at issue in this case. Finally, and most importantly, *Laurel Baye* did not in any way address the question of the deference due the Board's construction of either the particular provisions of the statute at issue here or any other provisions of the Act. This appears to

be because the Board never offered an interpretation of the Act for which deference was sought.

We face a very different situation in this case than the situation faced by the court in *Laurel Baye*. Here, the Board *has* offered a reasonable interpretation of statutory language in the Act – statutory language different from the statutory provisions at issue in *Laurel Baye*. And as Judge Griffith explains, the Board's interpretation is one to which we must defer pursuant to the firmly established principles enunciated by the Supreme Court in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984). Alternatively, as Judge Srinivasan contends, *see SSC Mystic Operating Co. v. NLRB*, No. 14-1045 (D.C. Cir. September __, 2015) (Srinivasan, J., concurring), we must defer to the Board because a court's prior judicial construction of a statute does not trump an agency construction that is otherwise entitled to deference under *Chevron* unless "the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005). Under either view, *Laurel Baye* is not binding precedent here because the relevant terms of the statute at issue in this case are unquestionably ambiguous.

In sum, the decision in *Laurel Baye* does not control the judgment in this case. This case poses what Professor Waldron would call a "distinct legal problem" that was neither raised by the parties nor addressed by the court in *Laurel Baye*. Consequently, "[a]ny observations [from that opinion] which could be regarded as having a bearing upon the question now before us would be taken out of their proper relation." *Wright v. United States*, 302 U.S. 583, 593 (1938); *see also Whitacre v. Davey*, 890 F.2d 1168, 1172 (D.C. Cir.

1989) ("We cannot count as controlling a decision that never touched upon the issue we confront" when that point "was simply not considered" in the prior case). The general expressions from *Laurel Baye* to which the dissent refers cannot be confused with binding precedent. To rely on these general expressions, taken from a case whose context is materially different from the case before us, flies in the face of the core principles of *stare decisis*. *See Weyerhauser v. Hoyt*, 219 U.S. 380, 394 (1911) ("[G]eneral language" used in a prior opinion should not be "separated from its context and disassociated from the issues which the case involved" and then given controlling weight.).

The dissent suggests that we have betrayed "the most important characteristic of a collegial appellate court" by failing to give "careful attention [and] respect" to the law of the circuit. It is hard to take this claim seriously because it is premised on misguided notions of *stare decisis*. I therefore view the dissent's unfortunate statement as nothing more than a poignant example of hyperbole.

SILBERMAN, *Senior Circuit Judge*, dissenting: The merits of this case are not particularly important. I doubt whether we will see many situations in which an NLRB regional director certified an election during a period in which the NLRB lost its quorum, and that certification is subsequently challenged in an unfair labor practice proceeding. But, the case is nevertheless of great significance because the most important characteristic of a collegial appellate court is careful attention, respect, and adherence to precedent. I am afraid the majority opinion is a glaring example of a contrary approach.

I have previously authored an opinion in which I was faced with conflicting lines of authority because of my colleagues' failure to follow prior precedent, *see Vietnam Veterans of America v. Shinseki*, 599 F.3d 654 (D.C. Cir. 2010) (Silberman, J.), which I regarded then, and do now, as most unfortunate. Of course, every case with which we are presented has some factual difference, but not every case is legally distinguishable from every other. In deciding whether a new case is covered by previous precedent, it is the logic of the previous case's holding that is determinative. Petitioner's brief elegantly argued, succinctly, that we were bound by our prior decision in *Laurel Baye Healthcare of Lake Lanier, Inc. v. NLRB*, 564 F.3d 469 (D.C. Cir. 2009). I think petitioner is exactly correct and that should be the end of the matter.

## I.

The majority concludes that section 3(b) of the National Labor Relations Act, authorizing the Board to delegate to regional directors – civil servants, not political appointees – power to certify the results of an election, means that that power remains indefinitely in the regional director, even if the Board itself disappears (perhaps, because of a failure of the Senate to confirm any appointee). This power supposedly resides permanently in the regional director, even though the statute specifically provides that any interested party can appeal a

regional director's determination to the Board. And if the Board loses its quorum, or goes out of existence, that appeal right is lost.[1]

But even if a Board were to read its regulation to permit an appeal of a regional director's decision out of time – perhaps years later when a Board regained a quorum – the majority ignores the impact of a regional director's certification in the interim. An employer who refuses to recognize that certification may pay a price in labor relations. And the regional director's decision with respect to issues such as objectional conduct may deviate from Board policy.

As I discuss below, I think this construction would be a stretch, even if we were considering section 3(b) *de novo*, but we are not. We are bound by our prior opinion in *Laurel Baye*. In that case, we considered whether a Board delegation of all of its power to a subgroup of only three survived the drop in membership of the subgroup (and the Board) to only two. Although the statutory language is convoluted, we relied on two factors to conclude that the Board's powers had lapsed. We focused first on the most persuasive language – "[t]he quorum provision clearly requires that a quorum of the Board is, 'at all times,' three members," *id.* at 473 (citing 29 U.S.C. § 153(b)) – but we also relied on general agency principles reasoning broadly that an agent – in that case, the two member Board panel – lost its authority when the Board – the principal – lost its quorum. We never mentioned *Chevron*, implicitly concluding that the combination of the two factors ineluctably pointed to only one interpretation. As Judge Sentelle writes in the

---

[1]A party must seek Board review within 14 days of the regional director's issuance of a final disposition. 29 C.F.R. § 102.67(c) (as amended Dec. 15, 2014). The majority's reading of the regulation appears incorrect.

companion case, "*Laurel Baye* concluded that § 153(b)'s quorum requirement provision unambiguously requires the Board to have a quorum for a delegee to exercise its authority." *SSC Mystic Operating Co.*, Slip op. at 2 (Sentelle, J., dissenting). The Supreme Court, reviewing the same issue in *New Process Steel v. NLRB*, came to the same conclusion, that the Board had lost its authority, but it relied primarily on different language in the section.[2] 560 U.S. 674, 679-83 (2010). It explicitly did not adopt the general agency principles so important to our reasoning, recognizing that to do so would decide the very issue now before us – whether a regional director's authority survives the loss of Board membership. *Id.* at 684 n.4. The Supreme Court wanted that issue to remain open in its court, but – and this is the crucial point – the Court implicitly recognized that it did *not* remain open in our court. Moreover, even though our sister circuits declined to adopt *Laurel Baye*, they have uniformly read it as did the Supreme Court: as having decided the validity of board delegations to nonmembers in the absence of a quorum.[3] Our agency

---

[2]Although the Supreme Court's footnote four is at least clear in not adopting *Laurel Baye*'s agency rationale, its reasoning explaining why it does not is impenetrable.

[3]*See Kreisberg v. HealthBridge Mgmt., LLC*, 732 F.3d 131, 140 (2d Cir. 2013); *Frankl v. HTH Corp.*, 650 F.3d 1334, 1354 (9th Cir. 2011); *Osthus v. Whitesell Corp.*, 639 F.3d 841, 844 (8th Cir. 2011); *Overstreet v. El Paso Disposal, L.P.*, 625 F.3d 844, 852-54 (5th Cir. 2010) ("[*Laurel Baye*] held that when the Board's membership drops to two, it loses its quorum and '[i]n the context of a board-like entity, a delegee's authority therefore ceases the moment the vacancies or disqualifications on the board reduce the board's membership below a quorum.'"). These circuit cases deal with the General Counsel of the Board's authority to continue to seek 10(j) injunctions when the Board loses its quorum. Board delegations of duties to the General Counsel are governed by a separate statutory provision. *See* 29 U.S.C.

reasoning was not, as the majority puts it, "separate," it was integral to *Laurel Baye*'s statutory interpretation, and therefore applies equally to our case. Indeed, it is *a fortiori* because we are dealing with a delegation, not to a subgroup of Board members, but rather to a much lesser-ranked official, a regional director.

Notwithstanding the Supreme Court's interpretation of *Laurel Baye*, the majority would distinguish that case on the theory that a delegation to an agent with lesser authority (a regional director) somehow survives the disappearance of the principal, even though a more senior agent's authority would not. It should be noted, the majority does not cite any case so holding. To give the government its due, the Board never makes this cockamamie argument (I thought we avoided relying on arguments not presented by parties because to do so suggests we are result-oriented). In any event, I do not understand why the regional director's authority is described as "non-final" when the very issue in this case is whether the regional director's certification of an election is final.

## II.

As I noted above, I think that if we were not bound by *Laurel Baye*, I would still regard the Board's contention that the regional director's authority to certify an election extends indefinitely, even if the Board went out of existence for years, as an impermissible construction of the statute.

---

§ 153(d). The General Counsel – a Presidential appointee – has unreviewable discretion to seek a complaint whether or not the Board is in existence. Therefore it is reasonable to conclude that the Board's permanent delegation to the General Counsel to seek an injunction is simply an addition to his or her authority to file a complaint.

The majority acknowledges the statute does not address the question whether the regional director's power lapses when the Board loses its quorum or ceases to exist, but contends that that is a statutory "silence" under the *Chevron* doctrine, which the NLRB is authorized to fill. And it asserts that the Board's interpretation is reasonable under *Chevron*'s second step. Actually, if *Chevron* applied, I think such an interpretation would be flatly unreasonable. We must bear in mind that even if we are following *Chevron*'s second step, we are construing a Congressional act – the second step is not open sesame for the Agency. After all, the rest of that statutory section deals specifically, although in a rather convoluted fashion, with the circumstances in which the Board loses authority because of a lack of a quorum. It is quite incredible that Congress would nevertheless have implicitly bestowed on regional directors permanent authority *ad infinitum*, even in the total absence of a supervising Board. It should be noted that neither the majority opinion nor Judge Edwards's and Judge Srinivasan's concurrences grapple with the statutory structure or language to reach their conclusion that the interpretation they adopt is actually "reasonable."

Be that as it may, we cannot affirm the Board based on *Chevron* deference in this case. The Board never purported to interpret an ambiguity in the statute. Instead, it boldly asserted that, pursuant to the statute, "NLRB Regional Directors remain vested with the authority to conduct elections and certify their results regardless of the Board's composition at any given moment." *UC Health & UC Health Pub. Safety Union*, 360 N.L.R.B. No. 71, *1 n.2 (Mar. 31, 2014). We have held repeatedly that "[d]eference to an agency's statutory interpretation is only appropriate when the agency has exercised its own judgment, not when it believes that interpretation is compelled by Congress." *Arizona v. Thompson*, 281 F.3d 248, 254 (D.C. Cir. 2002) (internal citations and emphasis omitted).

*See also Peter Pan Bus Lines*, *Inc. v. Fed. Motor Carrier Safety Admin.*, 471 F.3d 1350, 1354-55 (D.C. Cir. 2006); *Transitional Hosps. Corp. v. Shalala*, 222 F.3d 1019, 1029 (D.C. Cir. 2000). The majority argues that the Board never explicitly stated that the statute compelled the construction, but what else can the Board have intended when it flatly states what the statute meant.[4]

Moreover, the Supreme Court has rejected *Chevron*'s applicability to section 3(b). Even though the language the Supreme Court relied on, as I noted, is rather convoluted, the Supreme Court's opinion in *New Process Steel* never mentioned *Chevron* – despite the government's reliance on *Chevron* deference in its Supreme Court brief. Although the Court's opinion frankly acknowledged two possible interpretations of what it called section 3(b)'s delegation clause, it simply picked the one it thought preferable – leading to the same result we chose in *Laurel Baye*. *See New Process Steel*, 560 U.S. at 679-83. It is, therefore, decisive, for our purposes, that the Court implicitly but necessarily concluded that, for whatever reason, *Chevron* deference was inappropriate in construing section 3(b). *See SSC Mystic Operating Co.*, Slip op. at 2–3 (Sentelle, J., dissenting). In that regard, the other circuits, construing the companion language dealing with the General Counsel's delegated authority to seek 10(j) injunctions, have followed the Supreme Court's lead and have ignored *Chevron*.[5]

\* \* \*

---

[4]If the majority was correct in concluding that *Chevron* applied, it certainly should remand and allow the agency to exercise its judgment. *See PDK Labs. Inc. v. U.S. DEA*, 362 F. 3d 786, 798 (D.C. Cir. 2004).

[5]With the exception of one concurring Eighth Circuit Judge. *See Osthus*, 639 F.3d at 845-48 (Colloton, J. concurring).

Judge Srinivasan's concurrence in the companion case disagrees with the majority's conclusion that the panel's decision in *Laurel Baye* was based on an unambiguous reading of the plain language, and chooses to read *Laurel Baye* as only adopting the "best" reading of an ambiguous statute.[6] By so doing, Judge Srinivasan essentially accuses the *Laurel Baye* panel of disregarding governing law applying to judicial review of agency statutory interpretations in formal adjudication. That governing law, *Chevron* – with certain specific exceptions, such as avoidance of serious constitutional issues[7] – for over thirty years has banned courts of appeal from doing exactly what Judge Srinivasan accuses the *Laurel Baye* panel of doing; rejecting an agency statutory interpretation of supposedly ambiguous language in favor of what a reviewing court believes is a better or best reading.

Judge Srinivasan relies on *Brand X* as support for his analysis – suggesting that it allows a court reviewing agency interpretation of ambiguous language to choose the better interpretation. But that is a flagrant misreading of the case. *Brand X* applies in situations quite apart from *Laurel Baye*. The first is the question of how do reviewing courts deal with a pre-

---

[6]Judge Srinivasan ignores the fact that the Supreme Court's decision - both the majority and the dissent as Judge Sentelle points out, *see SSC Mystic Operating Co.*, Slip op. at 2 (Sentelle, J., dissenting) – ignored *Chevron*, or its doctrine, in deciding *New Process Steel* – which certainly indicates, as I have argued above, that *Chevron* is not to be used in interpreting section 3(b), as Judge Srinivasan does. Granted, the Supreme Court in *New Process Steel* did ignore *Chevron* without explanation, but it is not subject to the same restraints which bind lower federal courts.

[7]*See Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council*, 485 U.S. 568 (1988).

*Chevron* judicial decision if the agency subsequently disagrees. The Supreme Court explained that if a prior judicial decision announced the only acceptable interpretation of a statute that opinion governed, but if the earlier judicial opinion – properly read – only relied on a better interpretation, the agency was free to adopt a different reasonable construction. The second situation involves a judicial affirmance of a prior agency interpretation. Again, the agency can change its interpretation to another reasonable one if the prior judicial opinion was limited to accepting the agency interpretation as reasonable. The third situation, as occurred in *Brand X* itself, is when an agency departs from a prior judicial decision that had reviewed the interpretation of an entity not entitled to *Chevron* deference.[8] Because the previous court needn't have deferred under *Chevron*, it may have opted for the "best," but not the only, permissible, interpretation. The agency may thus later adopt another reasonable construction. None of those situations apply here. *Brand X* hardly suggested that in the future courts may reject a federal agency statutory interpretation as not the "best one," which would be inconsistent with *Chevron*.

Judge Srinivasan suggests, although he does not quite assert, that significance should be placed on the fact that the NLRB did not seek *Chevron* deference in *Laurel Baye*. But that is often true when an agency believes its interpretation is compelled by the statute. Indeed, in *Laurel Baye*, as in many other cases, the agency flatly asserted that its reading resulted

---

[8]*Brand X* reviewed an agency interpretation that departed from a previous judicial construction in *AT&T Corporation v. City of Portland*, 216 F.3d 871 (9th Cir. 2000). *AT&T* itself *did not* apply *Chevron* in its analysis – and opted for the best, not the only, interpretation – because it was reviewing the construction of a local, municipal franchising board (an entity to which *Chevron* deference was not owed).

from the plain language of the statute, rather than an exercise in discretion. That is not a hypothesis, as Judge Srinivasan suggests; it is the obvious reading of the Board's decision. And as Judge Sentelle points out, because the statute was thought by the panel to be unambiguous, *Chevron* was irrelevant. The important principle of administrative law is that federal courts of appeals for almost 30 years have followed *Chevron*'s command (with certain recognized exceptions) that agency interpretations of ambiguous language in a formal adjudication, *see United States v. Mead Corp.*, 533 U.S. 218 (2001), are entitled to deference and affirmance if reasonable. That is so – and there are no deviations in our cases – notwithstanding whether *Chevron*'s familiar two-step analysis is explicitly "walk[ed] through," *see SSC Mystic Operating Co.*, Slip op. at 3 (Srinivasan, J., concurring). If we think, notwithstanding the agency's claims, that a statute is actually ambiguous, we are not free to disregard *Chevron* and opt for our own "best" reading, as Judge Srinivasan seems to suggest we can. We must instead remand to an agency for its subsequent resolution of the ambiguity. *See PDK Labs. Inc. v. U.S. DEA*, 362 F. 3d 786, 798 (D.C. Cir. 2004). *Chevron* is as much a principle of judicial review of agency action as is *Chenery*[9] or *Vermont Yankee*.[10]

Judge Srinivasan searches for another reason *Chevron* may not have been applied. He suggests that the *Laurel Baye* panel may have secretly denied deference based on an argument made by the company in *Laurel Baye* – that *Chevron* deference was inappropriate because the issue went to the Board's jurisdiction. To be sure, this was a question which once troubled panels of this court. *See New York Shipping Ass'n, Inc. v. Federal*

---

[9]*See SEC v. Chenery Corp.,*332 U.S. 194 (1947).

[10]*See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council,* 435 U.S. 519 (1978).

*Maritime Comm'n*, 854 F.2d 1338, 1363 (D.C. Cir. 1988); *Nat'l Wildlife Fed'n v. ICC*, 850 F.2d 694, 699 (D.C. Cir. 1988); *American Civil Liberties Union v. FCC*, 823 F.2d 1554, 1567 n.32 (D.C. Cir. 1987). But since 1990 we have consistently rejected that concept as an exception to *Chevron*.[11] *See Connecticut Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 481 (D.C. Circ. 2009); *Nat'l Ass'n of Regulatory Util. Comm'rs v. FERC*, 475 F.3d 1277, 1279 (D.C. Cir. 2007); *Detroit Edison Co. v. FERC*, 334 F.3d 48, 53 (D.C. Cir. 2003); *Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 694 (D.C. Cir. 2000); *Oklahoma Natural Gas Co. v. FERC*, 28 F.3d 1281, 1284 (D.C. Cir. 1994); *Bus. Roundtable v. SEC*, 905 F.2d 406, 408 (D.C. Cir. 1990). The cases cited by Judge Srinivasan, with all due respect for the University of Illinois Law Review, do not stand for the contrary proposition; they don't even mention agency "jurisdiction." It is flatly inconceivable that any panel would accept Judge Srinivasan's hypothetical reasoning sub silentio.[12]

In sum, since *Laurel Baye* failed to accept the agency's interpretation, it *must* have been because it determined that the language was susceptible of only one meaning. It is the only explanation of *Laurel Baye* consistent with both Supreme Court commands and our own precedent.

\* \* \*

---

[11]Of course, the Supreme Court subsequently put the issue to rest in *City of Arlington v. FCC*, 133 S. Ct. 1863 (2013).

[12]It is worth noting that the *Laurel Baye* panel members Judges Williams, Sentelle, and Tatel had, collectively, nearly 60 years of experience reviewing agency statutory interpretations.

Three of my colleagues have explored reasons not to follow *Laurel Baye*. I think they are all unpersuasive; *Laurel Baye* is binding precedent.

Regretfully I dissent.