# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 13, 2018            Decided July 31, 2018

No. 16-1343

HOSPITAL OF BARSTOW, INC., DOING BUSINESS AS BARSTOW
COMMUNITY HOSPITAL,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

CALIFORNIA NURSES ASSOCIATION/NATIONAL NURSES
ORGANIZING COMMITTEE,
INTERVENOR

———

Consolidated with 16-1289

———

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

———

*Kaitlin A. Kaseta* argued the cause for petitioner. With her
on the briefs was *Bryan T. Carmody*.

*Barbara A. Sheehy*, Attorney, National Labor Relations
Board, argued the cause for respondent. With her on the brief

were *Richard F. Griffin*, *Jr.*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Jill A. Griffin*, Attorney.

*Nicole Daro* argued the cause and filed the brief for intervenor.

Before: GRIFFITH, SRINIVASAN and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SRINIVASAN.

SRINIVASAN, *Circuit Judge*: This case comes to this court a second time. It grows out of a decision of the National Labor Relations Board holding that Hospital of Barstow refused to bargain in good faith with a union representing nurses at the facility. The main issue concerns whether a Regional Director of the Board retained authority to certify the union during a period in which the Board itself lacked power to take action because its membership had slipped below the statutorily mandated quorum. If the Board itself had lost power to take any action, could a Regional Director, exercising Board-delegated authority, conduct a representation election and certify the results?

In previous decisions, we held that, notwithstanding the lapse of a Board quorum, Regional Directors retain authority to direct elections administered under a so-called stipulated election agreement—an agreement under which the employer and union agree to have a Regional Director conduct the election, but subject to the possibility of Board review if a party opts to seek it. *See UC Health v. NLRB*, 803 F.3d 669 (D.C. Cir. 2015); *SSC Mystic Operating Co. v. NLRB*, 801 F.3d 302 (D.C. Cir. 2015). This case involves a so-called consent election agreement, not a stipulated election agreement. In a

consent election agreement, the parties agree in advance that the Regional Director's decisions will be final and unreviewable.

In our previous decisions concerning stipulated election agreements, we deferred to the Board's interpretation of the NLRA's quorum provision in upholding the authority of Regional Directors to conduct and certify elections when the Board lacks a quorum. When we first considered this case, the Board had yet to address whether it had the same understanding of the quorum provision in the context of a consent election agreement. We remanded the case to enable the Board to consider that question. *Hosp. of Barstow, Inc. v. NLRB*, 820 F.3d 440 (D.C. Cir. 2016).

On remand, the Board saw no salient difference between consent election agreements and stipulated election agreements. It thus interpreted the NLRA's quorum provision to allow Regional Directors to conduct representation elections under a consent election agreement notwithstanding the lapse of a Board quorum. As in our previous decisions, we again sustain the Board's understanding of the statute as reasonable. We also reject the hospital's various challenges to the Board's finding of unfair labor practices and to the remedies imposed by the Board.

I.

A.

The National Labor Relations Act provides that the Board shall consist of five members, 29 U.S.C. § 153(a), and allows the Board to delegate its powers to panels made up of three or more members, *id.* § 153(b). The Act prescribes that "three

members of the Board shall, at all times, constitute a quorum of the Board." *Id.*

The same NLRA provision authorizes the Board to delegate to Regional Directors the authority to conduct representation elections, rule on the parties' objections to the election procedures, and certify the results. *See id.* In 1961, the Board delegated its authority over representation proceedings to Regional Directors, who have conducted representation elections since that time. *See* Delegation of Authority, 26 Fed. Reg. 3911-02 (May 4, 1961). The Board retains authority to review any action of a Regional Director upon the filing of a request by an interested party. But parties also can waive their right to request Board review. *See* 29 C.F.R. § 102.67(g). The result is that a Regional Director's action is final if the parties elect not to seek Board review or if the Board denies review and leaves the underlying decision undisturbed.

As of January 3, 2012, the terms of three Board members had expired and their seats remained vacant because the Senate did not confirm the President's nominees. On January 4, 2012, the President, asserting authority under the Recess Appointments Clause, U.S. Const. art. II, § 2, cl. 3, appointed three individuals to the Board. The Supreme Court, however, held those recess appointments to be invalid. *NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014). On July 30, 2013, the Senate confirmed two new nominees to the seats. During the intervening period, the Board lacked a quorum. *See* 29 U.S.C. § 153(b). The Regional Directors nonetheless continued to conduct representation elections and certify the results pursuant to the Board's 1961 delegation of authority.

B.

Hospital of Barstow operates an acute-care facility in California. In 2012, the California Nurses Association/National Nurses Organizing Committee (the Union) initiated an organizing campaign to represent Barstow's nurses. On May 2, 2012, during the time the Board lacked a quorum, Barstow and the Union entered into a consent election agreement, under which a Regional Director would conduct the election and the parties agreed that the Regional Director's election rulings and certification would be final.

The nurses voted in favor of the Union. Barstow lodged two objections with the Regional Director, both of which were rejected. On June 29, 2012, the Regional Director certified the Union's election. Soon after, Barstow and the Union commenced the bargaining process, but the negotiations ended after Barstow declared an impasse. In September 2012, the Union filed a charge with the Board alleging that Barstow had engaged in unfair labor practices and had refused to bargain with the Union. An administrative law judge agreed and found that Barstow had violated the Act.

The Board largely affirmed the ALJ's decision. *Hosp. of Barstow, Inc.*, 361 NLRB 352 (2014). The Board determined that Barstow, in two ways, had failed to bargain in good faith. First, Barstow refused to submit proposals on many of the labor issues over which the parties were bargaining, stating that it would do so only after the Union submitted its proposals on all issues. Second, Barstow declared impasse over the Union's use of certain customized forms that enabled a nurse to document situations that might be unsafe or jeopardize the nurse's license. The Board also concluded that Barstow committed an unfair labor practice when it unilaterally changed its certification training policy. Finally, the Board held that

Barstow, by entering negotiations with the Union, had waived its ability to contend that the Board's lack of a quorum divested the Regional Director of authority to certify the election. The Board thus did not reach the merits of that issue.

To remedy Barstow's bargaining violations, the Board ordered Barstow to cease its unfair practices and resume bargaining with the Union. The Board also required Barstow to reimburse the Union's negotiating expenses.

Barstow petitioned for review in this court. We held that the Board had erred in ruling that Barstow waived its ability to challenge the Regional Director's authority to conduct the representation election. *Hosp. of Barstow*, 820 F.3d at 442-43. With regard to the merits of that issue, we had recently sustained the Board's understanding that, notwithstanding the lapse of a Board quorum, Regional Directors retained authority to certify elections conducted pursuant to a stipulated election agreement, under which either party can seek Board review of the Regional Director's actions. *See UC Health*, 803 F.3d 669; *SSC Mystic*, 801 F.3d 302. This case, though, involved a consent election agreement, under which the parties agree that a Regional Director's election rulings will be final. 29 C.F.R. § 102.62(a). And whereas we had deferred to the Board's interpretation of the NLRA's quorum provision in the context of a stipulated election agreement, the Board had yet to interpret the provision in the context of a consent election agreement. We remanded the case to enable the Board to opine on whether, in the latter context (like in the former one), a Regional Director retains authority to certify representation elections during a time in which the Board lacks a quorum. *Hosp. of Barstow*, 820 F.3d at 445.

On remand, the Board interpreted the NLRA to authorize Regional Directors to continue exercising their delegated

authority under a consent election agreement, notwithstanding a lapse in the Board's quorum. *Hosp. of Barstow, Inc.*, 364 NLRB No. 52, slip op. at 4 (July 15, 2016). The Board also readopted its earlier decision that Barstow had violated the Act and reissued its order of remedies. *Id.* at 4-5.

Barstow now petitions for review of the Board's decision, and the Board seeks cross-enforcement of its order. The Union has intervened in support of the Board's decision.

## II.

Barstow principally contends that the Regional Director lacked delegated authority to conduct and certify the representation election because, at the time, the Board did not have a statutorily mandated quorum of three members. We reject that challenge, and also reject Barstow's various challenges to the Board's finding of unfair labor practices and the associated remedies.

## A.

The NLRA prescribes that "three members of the Board shall, at all times, constitute a quorum." 29 U.S.C. § 153(b). The same provision also authorizes the Board to delegate to Regional Directors the Board's authority to conduct representation elections and certify the results. *Id.*

## 1.

In *UC Health*, 803 F.3d 669, we upheld the Board's interpretation of the NLRA's quorum provision to allow Regional Directors to direct and certify representation elections during a time the Board lacks a quorum. The case involved an election conducted pursuant to a stipulated election agreement, under which the parties can opt to seek the Board's

discretionary review of the Regional Director's election rulings.  *See id.* at 671-72.

*UC Health* examined the Board's interpretation of the quorum provision under "the familiar two-step *Chevron* test." *Id.* at 673 (citation omitted).  At the first step, we "conclude[d] that the statute is silent on the issue of the Regional Director's power to act when the Board lacks a quorum." *Id.* at 674.  We thus proceeded to assess whether, at the second step, the Board's interpretation "is reasonable and consistent with the statute's purpose." *Id.* at 675.  We held that "the Board's interpretation easily meets this requirement." *Id.*

We explained that the question was not whether the Board itself (or a subset of the Board) could take actions when it lacked a quorum.  That had been the issue we addressed in *Laurel Baye Healthcare of Lake Lanier, Inc. v. NLRB*, 564 F.3d 469 (D.C. Cir. 2009).  There, we determined that a subset of the Board could not exercise the Board's "plenary, final authority . . . in its place" at a time when the Board lacked a quorum.  *UC Health*, 803 F.3d at 678-79 (discussing *Laurel Baye*).

In *UC Health*, the question instead was whether, when the Board lacks a quorum, a Regional Director can exercise authority that had been delegated by the Board at a time it did have a quorum.  We emphasized that, unlike the Board (or a subset of the Board as in *Laurel Baye*), Regional Directors "never similarly occupy the Board's role as a final decisionmaker." *Id.* at 679.  "No decision of the Regional Directors is ever final under its own power." *Id.* at 680.  Rather, "[o]nly the acquiescence of the parties or the Board's ratification can give binding force to a Regional Director's determination." *Id.*  "In other words," we reasoned, "a Regional Director never has the last say on anything unless a

party fails to object. In that event, it is the parties' choice to leave the Regional Director's decisions unchallenged that effectively makes the election final." *Id.*

"Moreover," we explained, "allowing the Regional Director to continue to operate regardless of the Board's quorum is fully in line with the policy behind Congress's decision to allow for the delegation in the first place." *Id.* at 675. We determined that the purpose of allowing a delegation of authority to Regional Directors was "to expedite final disposition of cases by the Board." *Id.* (citation omitted). "And at least those unions and companies that have no objections to the conduct or result of an election can agree to accept its outcome without any Board intervention at all." *Id.* at 675-76. We thus deferred to the Board's reasonable interpretation of the NLRA's quorum provision, *id.* at 676, and we reiterated that holding in our companion decision in *SSC Mystic*, 801 F.3d at 308-09.

2.

This case, unlike *UC Health* and *SSC Mystic*, involves an election conducted under a consent election agreement. Whereas the parties to a stipulated election agreement can seek discretionary Board review of a Regional Director's election decisions, the parties to a consent election agreement agree to forgo Board review and accept the Regional Director's decisions as final. The Board found that distinction to be an immaterial one in its decision below.

The Board explained that, even in the case of a stipulated election agreement, the Regional Director's decisions can still be final if the parties do not seek Board review. The Board saw no "meaningful distinction between the 'finality' accorded to the Regional Director's certification of [a] representative based

on the parties' consent election agreement and the 'finality' accorded to the Regional Director's certification of [a] representative in *UC Health* based on the parties' choice not to seek Board review to which they otherwise were entitled under their stipulated election agreement." *Hosp. of Barstow*, 364 NLRB No. 52, slip op. at 3. Because "it is the parties' agreement, not the Board's delegation, that gives the Regional Director's decision finality" under a consent election agreement, the Board determined that the lapse of a quorum did not divest the Regional Director of authority to certify the Union in this case. *Id.* at 6.

Barstow urges us to reject the Board's interpretation of the NLRA's quorum provision in the context of a consent election agreement. As in *UC Health*, however, we again defer to the Board's interpretation of the statute. *UC Health* explains why our decision in *Laurel Baye* does not control when the question concerns the exercise of delegated authority by a Regional Director (as opposed to a subset of the Board "occupy[ing] the Board's role as a final decisionmaker"). *UC Health*, 803 F.3d at 679. *UC Health* also establishes that the quorum provision is ambiguous on whether a Regional Director retains authority to certify a representation election when the Board lacks a statutory quorum. *See id.* at 674. The question for us, then, is whether the Board's interpretation is reasonable, in which case we must defer to it. *Id.* at 675. We conclude the Board's interpretation is reasonable.

The sole potentially salient difference between stipulated election agreements and consent election agreements is that, in the latter, the parties agree at the outset that they will forgo Board review. The parties thus know in advance that the Regional Director's actions will generally be final. *Cf. Pierre Apartments*, 217 NLRB 445, 446 (1975) (noting possibility of Board review even under consent election agreement if there is

fraud, misconduct, or gross mistakes amounting to arbitrary and capricious rulings by the Regional Director.).

But while the parties know that the Regional Director's decisions will be final in the case of a consent election agreement, the finality results from the parties' choice to forgo Board review, not from the Board's delegation of authority itself. In that sense (and as the Board explained), the finality arising under a consent election agreement mirrors the finality arising under a stipulated election agreement when neither party chooses to seek Board review. The Board reasonably saw no material distinction between the two. In both situations, the delegation of authority to the Regional Director does not inherently involve authority to render final Board decisions. Rather, in both situations, the parties can choose to give a Regional Director the final say by opting against Board review.

It is true that, under the Board's regulations, a Regional Director's decisions pursuant to a consent election agreement are treated as "final . . . with the same force and effect, in that case, as if issued by the Board." 29 C.F.R. § 102.62(a). But the regulations similarly describe a Regional Director's decision under a stipulated election agreement as "final" if there is no grant of discretionary review by the Board, 29 C.F.R. § 102.67(g), which includes a situation in which neither party asks for Board review. *See* 2 NLRB Casehandling Manual, Representation Proceedings § 11364.7(a) (Jan. 2017). And while a Regional Director's actions under a consent election agreement are accorded "the same force and effect . . . as if issued by the Board," they have that "force and effect" only "in that case," 29 C.F.R. § 102.62(a): unlike the Board's own rulings, a Regional Director's decision is not "Board precedent in future cases." Proposed Rules Governing Consent-Election Agreements, 69 Fed. Reg. 44,612, 44,612 (proposed July 22, 2004) (rule codified at 29 C.F.R. § 102.62).

That difference reinforces that the Board could reasonably understand a Regional Director's delegated authority to survive the Board's loss of a quorum.

Barstow submits that, under our decisions in *UC Health* and *SSC Mystic*, the parties to a consent election agreement cannot give a Regional Director the power to render final decisions in a given case. Barstow relies on our holding in *UC Health* and *SSC Mystic* that, when the parties agree to a Regional Director's conduct of a representation election, they do not thereby waive their ability to challenge—on judicial review—the Regional Director's authority to act. *UC Health*, 803 F.3d at 673; *SSC Mystic*, 801 F.3d at 308. That holding about the ability to raise a challenge on judicial review has no bearing on the issue we consider here. In particular, nothing in *UC Health* or *SSC Mystic* suggests that parties who desire to enter into a consent election agreement cannot agree to give the Regional Director the final say by waiving their ability to seek Board review.

Barstow, finally, attempts to draw a distinction between stipulated and consent election agreements based on timing. Under a stipulated election agreement, a Regional Director's decision becomes final only if the parties opt against seeking Board review after certification of the election. The parties to a consent election agreement, by contrast, waive their right to seek Board review at the outset, before the election begins. Barstow thus submits that, in the case of a consent election agreement, the Regional Director is cloaked with authority to provide the final say on election matters at the time of her or his rulings. And if the Board itself could not issue rulings at that time because of the absence of a quorum, Barstow argues, neither can the Regional Director.

The Board was not compelled to draw a distinction between consent and stipulated election agreements on that basis. In both contexts, a Regional Director exercises delegated authority to oversee and certify elections, and her rulings become final without Board action only if the parties choose to forgo seeking Board review. At every relevant time—the time of the Regional Director's rulings and certification, as well as the time of the parties' decision to forgo Board review—the Board may lack a quorum. Regardless, the Board permissibly concluded, the Regional Director does not "stand in the Board's place." *UC Health*, 803 F.3d at 680. Rather, the Regional Director exercises delegated, non-final authority, even though her decisions can be the final word if the parties choose to forgo Board review.

The parties' choice to do so, we held in *UC Health*, need not be seen to vitiate the Board's delegation of non-final election authority to Regional Directors, notwithstanding the lapse of a Board quorum. The same is true here. We thus defer to the Board's interpretation of the NLRA's quorum provision and conclude that the Regional Director had authority to conduct the election and certify its results in favor of the Union.

B.

Having concluded that the Regional Director had authority to certify the Union's election, we now turn to Barstow's challenges to the merits of the Board's decision, none of which we find persuasive.

1.

Barstow contends that the Board erred in rejecting Barstow's request to submit this dispute to arbitration. The Board has discretion to defer labor disputes to arbitration. *See*

*DaimlerChrysler Corp. v. NLRB*, 288 F.3d 434, 444-45 (D.C. Cir. 2002); *Collyer Insulated Wire, Gulf & W. Sys. Co.*, 192 NLRB 837, 840 (1971). In deciding whether to do so, the Board considers a number of factors, including the length and productivity of the parties' bargaining relationship, the existence of any claim of employer animosity toward the employees' exercise of protected rights, the coverage of the parties' arbitration agreement, and ultimately, the suitability of the dispute to arbitration. *See United Cerebral Palsy of NYC*, 347 NLRB 603, 605 (2006). We uphold the Board's decision on deferral as long as the decision is "rational and consistent with the Act." *DaimlerChrysler Corp.*, 288 F.3d at 444.

In this case, the Board declined to defer the dispute to arbitration for two reasons. First, the parties had not entered into a collective-bargaining agreement establishing an arbitration procedure. Second, the parties' bargaining relationship was brief and unproductive. The Board's reliance on those considerations is consistent with its precedent, and we see no basis to reject the Board's approach or conclusion.

With regard to the absence of an agreement establishing an arbitration procedure, Barstow argues that the parties had entered into a "Labor Relations Agreement" that included an arbitration provision. That agreement, however, was never signed or executed; and according to the agreement's own terms, it would take effect and bind the parties only if signed. As for the duration and nature of the parties' bargaining relationship, Barstow argues that the Board unduly focused on the brevity of the parties' relationship. But that focus was consistent with previous decisions in which the Board has determined that "short and fraught" relationships are not well suited for arbitration. *E.g., San Juan Bautista, Inc.*, 356 NLRB 736, 737 (2011). In short, the Board permissibly declined to defer the dispute to arbitration.

15

2.

The NLRA makes it an "unfair labor practice" for an employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). In that regard, the employer must "meet [with the Union] at reasonable times" and "confer in good faith with respect to wages, hours, and other terms and conditions of employment." *Id.* § 158(d). The employer also cannot interfere with, restrain, or coerce employees in the exercise of their protected rights. *Id.* § 158(a)(1).

The Board adopted the ALJ's finding that Barstow had violated the NLRA by refusing to submit its bargaining proposals until the Union set forth its proposal in full. The Board also adopted the ALJ's finding that Barstow violated the Act by declaring an impasse and refusing to bargain. We can overturn the Board's decision in those respects only if it is arbitrary or is unsupported by substantial evidence in the record. *See Wayneview Care Ctr. v. NLRB*, 664 F.3d 341, 348 (D.C. Cir. 2011). We sustain the Board's decision.

The record fully supports the Board's finding that Barstow failed to bargain in good faith by refusing to put forward proposals until the Union presented its proposals on every issue over which the parties were bargaining. Barstow observes that there had been some previous discussions of several bargaining subjects. But after reaching tentative agreements on a handful of issues, Barstow refused to offer further proposals until the Union set forth its proposal in full. To the extent Barstow claims that it could aggressively defend a bargaining position, it does not dispute that an outright refusal to submit proposals or counterproposals evidences bad-faith bargaining. *See, e.g.*, *Fed. Mogul Corp.*, 212 NLRB 950, 951 (1974).

The Board determined that Barstow also violated the Act by declaring a bargaining impasse over the Union's support of nurses using "assignment despite objection" ("ADO") forms to document conditions that, in the nurses' view, were unsafe or that could threaten their nursing licenses. The Board found that the ADO forms never became a subject of bargaining, such that Barstow could not declare an impasse over the matter. That finding is supported by substantial evidence. Neither Barstow nor the Union made any proposals concerning the forms. The only time the parties discussed them was when Barstow insisted that the Union discontinue using them before Barstow would resume the bargaining process. In that context, the Board permissibly concluded that Barstow's declaration of impasse was unlawful because it was based on an issue outside the scope of the parties' bargaining.

Barstow contends that the ADO forms were necessarily tied to the Union's bargaining proposal because the Union provided the forms to nurses who sat on the bargaining council. But that shows, at most, that the Union used the forms to prepare for negotiations; it hardly shows that the forms were a subject over which the parties in fact engaged in bargaining. To the contrary, the Union continued to express its willingness to bargain over the ADO forms and other issues even after Barstow declared impasse.

3.

Finally, Barstow argues that we should decline to enforce the Board's award of negotiating expenses to the Union. We have acknowledged that "the choice of remedies is primarily within the province of the Board." *United Steelworkers of Am. v. NLRB*, 376 F.2d 770, 773 (D.C. Cir. 1967). The Board can order reimbursement of an aggrieved party's bargaining expenses when the opposing party's bad-faith conduct has

"infected the core" of the process, rendering traditional remedies inadequate to remedy the violation. *Fallbrook Hosp. Corp. v. NLRB*, 785 F.3d 729, 738 (D.C. Cir. 2015). We upset the Board's choice of remedy only if the order was a "clear abuse of discretion." *United Steelworkers*, 376 F.2d at 773. We find no such abuse here.

The Board found that, throughout the bargaining process, Barstow "deliberately acted to prevent any meaningful progress" by refusing to bargain. *Hosp. of Barstow*, 361 NLRB at 355. Barstow does not dispute that it refused to provide bargaining proposals on many issues for the first five bargaining sessions, and subsequently refused to bargain until the nurses ceased using the ADO forms, ultimately declaring an impasse. Barstow contends that its conduct was not as egregious as the employers' conduct in previous Board decisions ordering a reimbursement remedy. But as we have explained, the Board's prior decisions do not necessarily establish a floor for reimbursement awards; rather, the Board weighs the facts of each case to determine whether reimbursement is necessary to make an aggrieved party whole. *See Fallbrook*, 785 F.3d at 738. Here, the Board took into account the totality of Barstow's bargaining conduct and permissibly determined that reimbursement of the Union's expenses was needed to remedy the violations.

\*    \*    \*    \*    \*    \*

In its opening brief, Barstow listed a number of issues beyond those discussed in this opinion when noting the issues raised by its petition. Barstow Op'g Br. 2-5. But Barstow forfeited those issues by offering no argument on them. *See, e.g.*, *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983). For the foregoing reasons, we deny Barstow's petition for

review and grant the Board's cross-application for enforcement.

*So ordered.*